**UNITED STATES of America,
Plaintiff,**

v.

**Carl William KRUSE, Jr. and Eastern
Electric Company, Defendants.**

**Civil Action No. 4:99cv144.**

United States District Court,
E.D. Virginia,
Newport News Division.

June 6, 2000.

---

**16.** This court need not decide the merits of Defendants' Rule 12(b)(6) motion until it rules on the issue of transfer of venue.

Craig P. Wittman, United States Attorney's Office, Norfolk, VA, for plaintiff.

Michael J. Gardner, Megan E. Burns, Williams, Mullen, Clark & Dobbins, Virginia Beach, VA, for defendants.

## ORDER AND OPINION

FRIEDMAN, District Judge.

*Procedural and Factual Background*

On March 22, 1999, Carl William Kruse, Jr. pled guilty to providing kickbacks to a government contractor in violation of the Anti–Kickback Act of 1986, 41 U.S.C. § 53. The government contractor receiving the kickbacks was an officer of Systems Engineering and Energy Management Associates ("SEEMA") which had been awarded a contract to provide services to the Department of the Air Force at Langley Air Force Base. Kruse was a general partner of Eastern Electric Company ("Eastern Electric"), which had been awarded a sub-contract for the Langley project. From 1992 to 1997, during the period of the SEEMA contract, Kruse was employed by SEEMA as a project manager. His responsibilities there included estimation of prices and negotiation with the government on delivery orders issued under the contract. During the period of the contract, a SEEMA officer solicited fifty-seven monetary payments totaling $544,560 and two interest-free loans totaling $240,000 as a reward for giving Eastern Electric the sub-contract and to ensure continued awards of sub-contracts. The checks for these payments were drawn on an Eastern Electric account, and Eastern Electric submitted fraudulent billings to SEEMA to cover the payments.

Kruse pled guilty to violations of 41 U.S.C. § 53, and on July 8, 1999, he was sentenced to twenty-four months incarceration, and he was ordered to pay a fine of $25,000 and restitution of $544,560 to the government contractor, both of which he has paid.

On December 2, 1999, the United States brought a civil action under the Anti–Kickback Act seeking recovery from Kruse and Eastern Electric. The Government sought $2,159,120 [1] from Kruse and $748,560 from Eastern Electric.

On April 25, 2000, the United States moved for summary judgment or, in the alternative, for partial summary judgment on the issue of liability for each of the fifty-nine kickbacks alleged. In its memorandum in support of its motion for summary judgment and during oral argument, the Government stated that it would not be seeking the per occurrence penalty.

On May 10, 2000, the defendants moved for summary judgment. Although they conceded liability under the statute in their Answer and during oral argument, the defendants argued that the Anti–Kickback statute itself is unconstitutional on the grounds that it violates due process and the Eighth Amendment's proscription of Excessive Fines. The defendants also argued that the amount of the principal of the two loans made to the SEEMA official should not be included as kickbacks.

## Analysis

### I. Summary Judgment

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) *cert. denied,* 498 U.S. 1109,

---

**1.** The complaint states that judgment against Kruse be entered "in the amount of $2,159,180 (two times the amount of each payment plus $10,000 for each payment)." The sum of twice the payments (2 times $784,560) plus $10,000 times each transaction ($590,000), however, is $2,159,120.

111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The facts and inferences to be drawn from the pleadings must be viewed in the light most favorable to the nonmoving party. *See Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir.1995). Summary judgment should be granted when the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. The Principals on the Loans Are Kickbacks

■ The defendants argued that the loans were innocent or incidental favors, "favors between friends," and thus are not included in the definition of "kickback." They argued that Kruse considered them valid and expected them to be repaid. The Government argued that providing the loans was criminal conduct, to which Kruse pled guilty.

According to 41 U.S.C. § 52(2), "[t]he term 'kickback' means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly...for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract."

Kruse admitted in his Answer that he provided the SEEMA official interest-free loans to reward favorable treatment. Moreover, the Court had previously accepted the factual findings of the Pre–Sentence Investigative Report on Kruse, which stated that "in consideration of the favorable treatment given to Eastern for sub-contract work under the SEEMA contract, [Kruse] made personal interest-free loans to the SEEMA officer; one for $180,000 and the other for $60,000." Because the loans were things of value provided for the purpose of rewarding favorable treatment, the Court **FINDS** that the principals of the loans constitute "kick-backs" for the purposes of the Anti–Kickback statute.

## III. Applicability of the Excessive Fines Clause

Whether recovery imposed under the Anti–Kickback statute is unconstitutionally excessive appears to be an issue of first impression. In *United States v. Lippert*, the Court of Appeals for the Eighth Circuit refrained from ruling on this issue in part because of the murkiness surrounding Supreme Court decisions in this area. *United States v. Lippert*, 148 F.3d 974, 978 (8th Cir.1998). On the one hand, the Supreme Court in *Austin v. United States* held that a fine that serves a retributive or deterrent purpose, even if it is in part remedial, is punitive and thus comes within the ambit of the Excessive Fines Clause. *Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). On the other hand, the Court in *United States v. Bajakajian* contemplated treating fines as remedial even though they far exceed the harm suffered so long as they are not grossly disproportionate to the gravity of the offense. *United States v. Bajakajian*, 524 U.S. 321, 341–42, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

Some reconciliation between these positions is made possible by considering the original purposes of the Eighth Amendment's Excessive Fines Clause as articulated by the Supreme Court. Historically, "the practice of awarding damages far in excess of actual compensation for quantifiable injuries was well recognized at the time the Framers produced the Eighth Amendment." *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 274, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (holding that the Excessive Fines Clause does not apply to punitive damages between private parties). Double or even treble damages have been recognized since the 13th century. *Id.* The Framers, well aware of this practice, did not aim to prevent large remedial damages; rather, they constructed the Ex-

cessive Fines Clause with the goal of preventing the government from abusing its power to punish. *Id.* at 275, 109 S.Ct. 2909. The test for invoking the Excessive Fines Clause, then, first considers whether the Government is acting in its prosecutorial role or in the role of an injured party.

Taken against this background, the majority and a vociferous dissent in *Bajakajian* provide guidance for how to resolve the apparent contradiction between the bright-line rule of *Austin* and the more impressionistic conclusions of *Bajakajian.* In *Bajakajian,* the Court held "that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of the defendant's offense." 524 U.S. at 334, 118 S.Ct. 2028. The dissent agreed that "[a] defendant must prove a gross disproportion before a court will strike down a fine as excessive." *Id.* at 348, 118 S.Ct. 2028.

■ From *Bajakajian* a two-part analysis can be distilled to determine whether the Excessive Fines Clause restricts the Government's ability to collect civil penalties. First, the Court must determine whether the recovery sought is remedial or punitive.[2] *Id.* at 328, 118 S.Ct. 2028. Secondly, if the Court finds the remedy to be punitive, it must then decide whether the recovery sought is grossly disproportionate to the gravity of the offense. *Id.* at 334, 118 S.Ct. 2028. In making these decisions the Court must be mindful of the Supreme Court's caveats: (1) "that judgments about the appropriate punishment for an offense belong in the first instance to the legislature," and (2) that "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise." *Id.* at 336, 118 S.Ct. 2028.

■ Title 41 U.S.C. § 55(a)(1) provides: "The United States may, in a civil action, recover a civil penalty from any person who knowingly engages in conduct prohibited by section 53 of this title. The amount of such civil penalty shall be—(A) twice the amount of the each kickback involved in the violation; and (B) not more than $10,000 for each occurrence of the prohibited conduct.

(2) The United States may, in a civil action, recover a civil penalty from any person whose employee, subcontractor or subcontractor employee violates section 53 of this title by providing, accepting, or charging a kickback. The amount of such civil penalty shall be the amount of that kickback."

The statute itself manifests both remedial and punitive intent. With its emphasis on the civil nature of this recovery, the statute appears to establish remedial damages. By linking the amount of recovery to the amount of the kickbacks, the statute ostensibly provides the Government with "rough remedial justice," that is, a form of "compensation according to somewhat imprecise formulas, such as . . . a fixed sum plus double damages, without being deemed to have imposed a punishment." *United States v. Halper,* 490 U.S. 435, 446, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), *abrogated on other grounds, Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). On the other hand, the statute calls the recovery a "penalty" and it permits a per occurrence penalty, which resembles a punitive fine.

The legislative history equally reflects the dual nature of this statute. Congress stated its remedial intentions by declaring that the amount of the penalty was "an amount which reasonably relates to the actual costs the government suffers when kickbacks occur." H.R. Rep. No. 99–964, 1986 U.S.C.A.N. at 5972. But the legislative history also suggests a deterrent, and thus punitive, purpose in that the amounts were selected with the thought that they "are reasonable in light of the serious

---

**2.** It is important to emphasize that the distinction is between remedial and punitive, not between civil and criminal. *Austin v. United*

*States,* 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993).

harm caused the government by kickbacks and the need to prevent such misbehavior." *Id.*

At least part of the purpose of the Anti–Kickback statute, then, is punitive, and the Court must continue its inquiry by determining whether the penalties set by the statute are grossly disproportionate to the offenses the statute proscribes.

Kickbacks do harm the government, "and there is a broad consensus (i) that it is difficult to prove the government's actual contract damages from a particular kickback scheme, and (ii) that the government must incur additional investigative and enforcement costs to ferret out and stop these abusive schemes." *United States v. Lippert,* 148 F.3d 974, 977 (8th Cir.1998) (citations omitted). Because the damage caused by kickbacks evades ready determination, Congress stated that it established the penalty as "an amount which reasonably relates to the actual costs the government suffers when kickbacks occur."

As suggested in *Bajakajian,* a statutory penalty that is proportional to the losses incurred may not necessarily trigger the Eighth Amendment's protection. *See United States v. Bajakajian,* 524 U.S. 321, 341–42, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). In *Bajakajian,* the Supreme Court explained that "early monetary forfeitures...were considered not as punishment for an offense, but rather as serving the remedial purpose of reimbursing the Government for the losses accruing from the evasion of customs duties." *Id.* at 342, 118 S.Ct. 2028. Thus, civil penalties imposed under the Anti–Kickback statute, insofar as they reimburse the Government, if roughly, may not be subject to the Excessive Fines Clause.

■ Even if the Eighth Amendment is triggered by the Anti–Kickback statute, the penalties as applied in this case are not unconstitutionally excessive with respect to either the gravity of the offense or the damages suffered by the government.

Kruse admitted in his Answer that between 1992 and 1997 he provided the SEE-MA officer payments which totaled approximately $544,560 for the purpose of rewarding favorable treatment. Kruse also admitted providing the officer of the government contractor $240,000 in interest-free loans.

The Government presented evidence that audit and investigative costs for the Department of Defense were in excess of $252,000 and that investigative costs for the FBI were in excess of $22,000. The Government stated that the prosecution of Kruse, the officer of the government contractor, and the government official required significant government expenditure and judicial resources. The Government averred that the cost of Kruse's and the government contractor's imprisonment is almost $88,000, and that supervised release for them will cost $18,668.88. The total value of these quantified expenses is $380,-668.88. In argument, the Government noted unquantifiable damages such as the deleterious effect of these kickbacks on the federal procurement system.

The Anti–Kickback Statute mandates that the government recover $1,569,120 from Kruse, double the amount of the kickbacks, and allows an additional recovery of up to $10,000 per occurrence. The statute also mandates that the government recover $784,560 from Eastern Electric, that is, the amount of the kickbacks. Given the damages both quantifiable and unquantifiable suffered by the Government and the gravity of the defendants' offenses, the Court FINDS that fines of $1,569,120 from defendant Kruse and $784,560 from defendant Eastern Electric are not unconstitutionally excessive. The Court further FINDS, however, that imposition of a $10,000 per occurrence penalty, which would add $590,000 to Kruse's fine, would impose an impermissible punishment in this instance.

## IV. Due Process Considerations

■ The defendants argue that the mandatory civil penalty deprives them of

property without due process of law. The defendants ground their due process argument in the history and development of the Anti–Kickback statute. Before its 1986 amendments, the Anti–Kickback statute applied only to cost-plus or reimbursable contracts where it was clear exactly how much the government lost. The 1986 amendment extended the statute to all negotiable contracts, thus perhaps attenuating the connection between the amount of the kickbacks and the government's loss. Here, the defendants argue that the kickbacks came out of the profits paid the government contractor and that the government would have paid the same amount for the contract whether there had been kickbacks or not.

Substantive due process claims not involving fundamental rights are reviewed under the rational basis standard. *Washington v. Glucksberg*, 521 U.S. 702, 728, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The legislative history of the 1986 Anti–Kickback statute suggests a rational relation between the legislation and its purposes, and the discussion herein on excessive fines suggests a rational relationship between the amount of losses and the amount sought. Procedurally, Kruse has had several opportunities to contest the amount of the kickbacks: prior to his guilty plea, during the sentencing phase, and in his Answer to the Government's civil complaint. Accordingly, the Court FINDS that the Anti–Kickback statute does not violate the defendants' Fifth Amendment right to due process.

### Conclusion

For the reasons stated above, the Court **GRANTS** partial summary judgment in favor of the Government and **DENIES** the defendants' motion for summary judgment. The Court **ORDERS** that the Government recover $1,569,120 from defendant Kruse and $784,560 from defendant Eastern Electric.

The Court REQUESTS the Clerk to send copies of this Order to all counsel of record.

It is so **ORDERED.**