2001 SD 52

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Mark L. BARTON, Defendant and Appellant.**

**No. 21493.**

Supreme Court of South Dakota.

Argued Nov. 30, 2000.

Decided April 25, 2001.

Mark Barnett, Attorney General, Craig M. Eichstadt, Deputy Attorney General, Pierre, SD, Attorneys for plaintiff and appellee.

William G. Taylor and Debra S. Sittig of Woods, Fuller, Shultz & Smith, Sioux Falls, SD, Attorneys for defendant and appellant.

LIEBERMAN, Circuit Judge.

[¶ 1.] Mark L. Barton (Barton) was found guilty of an overweight truck violation and fined a total of $11,425. We affirm.

## FACTS

[¶ 2.] Barton is a twenty-five year old farmhand employed by Alan Aughenbaugh and Sons. Aughenbaugh and Sons is a large farming operation in the Iroquois, South Dakota area. It employs fifteen people, has a seed and fertilizer dealership and an electronic development business.

[¶ 3.] On April 1, 1999, motor carrier enforcement officer Harlin Wipf was eastbound on U.S. Highway 14 near mile marker 368 in the Iroquois vicinity. He noticed a tractor approaching him from approximately a quarter mile away. Shortly thereafter, he observed that the tractor was pulling a grain cart. The tractor was a Steiger four wheel drive and it was pulling a Kinze 1200 grain cart.

[¶ 4.] Officer Wipf turned around and followed the grain cart in order to determine if it was loaded or empty. He noted that the tires were squatted and that the cart did not bounce and he felt the cart was obviously loaded. He also determined that the cart had a single axle. Wipf was aware that SDCL 32–22–16 permitted only twenty thousand pounds on a single axle. Because of the size of the cart, he felt that the weight of the cart alone would constitute the majority of the allowed weight under the statute. Based on these observations, Wipf stopped the vehicle.

[¶ 5.] As Officer Wipf approached the tractor, he thumped the side of the cart three or four times with his fist. Upon reaching the cab of the tractor, he encountered the driver, Barton. When asked if the cart was loaded, Barton responded that he had a partial load. Barton un-rolled the tarp covering the cart so Officer Wipf could look inside. Wipf testified that the cart was three-fourths or more full of wheat. Officer Wipf then asked Barton if he could weigh the cart and Barton agreed.

[¶ 6.] Officer Wipf weighed the cart using portable scales that are certified twice a year. A separate scale was placed under each of the four tires of the cart. The four separate numbers were added to arrive at 66,700 pounds. The amount of allowable weight for a single axle under SDCL 32–22–16 is 20,000 pounds. However, agricultural products are given a five percent weight tolerance so they are allowed 21,000 pounds. The citation Wipf issued alleged that the cart was 45,700 pounds overweight.

[¶ 7.] At trial, Barton argued that the stop was improper and that he should be allowed to have a jury trial. Barton further argued that the cart had two axles instead of one axle as asserted by the state. The trial court held that, because he would not be incarcerated, Barton was not entitled to a jury trial, that there was reasonable suspicion for the stop and that the cart had one axle, not two. At the close of the trial, the trial court imposed a fine and costs of $128 on Barton plus an overweight penalty of twenty-five cents per pound for a total of $11,425.

## STANDARD OF REVIEW

We recently clarified our standard of review. *See State v. Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488; *State v. Hirning*, 1999 SD 53, ¶ 9, 592 N.W.2d 600, 603. Fact findings are reviewed for clear error, but ultimately, in reviewing decisions on motions to suppress for asserted constitutional violations our standard of review is *de novo*. *Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d at 488 (citing *Ornelas v. United States*, 517 U.S. 690,

699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996)).

*State v. Morato,* 2000 SD 149, ¶ 10, 619 N.W.2d 655, 659.

[¶ 8.] The proper construction of a statute is a question of law and will be reviewed de novo. *Brim v. S.D. Bd. of Pardons and Paroles,* 1997 SD 48, ¶ 4, 563 N.W.2d 812, 813. The primary purpose of statutory construction is to determine the intent of the law. *See Moss v. Guttormson,* 1996 SD 76, ¶ 10, 551 N.W.2d 14, 17. " '[S]tatutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject.' " *See id.* (quoting *U.S. West Communications, Inc. v. Public Utilities Comm'n,* 505 N.W.2d 115, 122–123 (S.D. 1993)). " 'But, in construing statutes together it is presumed that the legislature did not intend an absurd or unreasonable result.' " *Id.*

## ISSUE ONE

### [¶ 9.] Whether the stop was constitutional.

[¶ 10.] Barton argues that the proper legal standard necessary to stop his vehicle was probable cause. Although Barton acknowledges that routine traffic stops require only reasonable suspicion, he argues that South Dakota requires a higher standard to stop and weigh a vehicle. In support of this proposition, he cites SDCL 32–22–50 which states:

> Any peace officer having reason to believe that the weight of a vehicle and load is unlawful is authorized to weigh the same either by means of portable or stationary scales and may require that such vehicle be driven to the nearest scales in the event such scales are within five miles.

Barton argues the operative language is "reason to believe." Barton cites several cases equating reason to believe with probable cause.

[¶ 11.] Barton's argument is misplaced. First of all, the statute provides that "[a]ny peace officer having reason to believe that the weight of a vehicle and load is unlawful is authorized to *weigh* the same ..." SDCL 32–22–50 (emphasis added). Even if we assume that "reason to believe" as used in this statute does equal probable cause, the statute mentions nothing of the initial stop. It would simply apply to weighing the vehicle.

[¶ 12.] Moreover, even reasonable suspicion is not necessary to stop a vehicle in this context. In *Ritter v. Johnson,* 465 N.W.2d 196, 197 (S.D.1991), Darrell Johnson, a civilian employee of the Motor Carrier Division of the South Dakota Highway Patrol, stopped the vehicle driven by Ritter and instructed him to return to a weigh station for weighing. As Ritter attempted to turn his vehicle around, the truck rolled over injuring Ritter and damaging the truck.[1] Ritter argued that since Johnson had no reason to believe he was in violation of any law that Johnson exceeded the scope of his authority under SDCL 32–22–50. *Id.* at 198 n. 1. In response to Ritter's claim that he was deprived of his constitutional right to be free from unreasonable seizure, we noted:

> Assuming without deciding that Johnson's order to Ritter which prompted Ritter to try to turn his truck around constituted a "seizure" within the meaning of the Fourth Amendment, such a

---

1. Johnson argued, and the trial court found, "that he acted within the scope of SDCL 32–2–7, which authorizes motor carrier inspectors to check the permits and weigh the loads of 'motor vehicles and motor carriers over and upon the highways of this state.' " *Ritter,* 465 N.W.2d at 198 n. 2.

seizure is clearly not an unreasonable seizure in view of the "closely regulated" nature of the trucking industry. The state has a "substantial interest" in enforcing its truck inspection regulatory scheme; warrantless inspections are "necessary to further the regulatory scheme"; and there is sufficient "certainty and regularity" in the application of the regulatory scheme to provide a "constitutionally adequate substitute for a warrant."

*Id.* at 199–200 (quoting *New York v. Burger*, 482 U.S. 691, 702–703, 107 S.Ct. 2636, 2643–44, 96 L.Ed.2d 601 (1987)). As Barton was also stopped pursuant to SDCL 32–22–50, the same reasoning applies here. Thus, assuming, *arguendo*, that there was a seizure of Barton, it would not be unreasonable given the closely regulated nature of the trucking industry.

[¶ 13.] In addition to the closely regulated nature of the trucking industry, reasonable suspicion also existed to stop Barton. " 'The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures and is implicated when a vehicle is stopped.' " *State v. Vento*, 1999 SD 158, ¶ 8, 604 N.W.2d 468, 470 (citations omitted). "A police officer must have a reasonable suspicion to stop an automobile. This has been further interpreted to require the officer to have a 'specific and articulable suspicion of a violation before a[n] [automobile] stop will be justified.' " *Id.* (quoting *State v. Cuny*, 534 N.W.2d 52, 53 (1995)). The requisite level of suspicion necessary to effectuate the stop of a vehicle is not equivalent to probable cause necessary for an arrest or a search warrant. *See State v. Sleep*, 1999 SD 19, ¶ 7, 590 N.W.2d 235, 238. "The factual basis needed to support a traffic stop is minimal." *Id.*

[¶ 14.] The state has a substantial interest in protecting its highways from overweight violations. Stops of certain vehicles are necessary to ensure that the vehicles are within statutorily prescribed limits. Officer Wipf noted the sheer size of the grain cart and surmised that, even if it was only partially loaded, it would be in violation of the statute. Officer Wipf also observed that the tires were squatted and that the cart did not bounce. In his experience, an unloaded cart would not display these properties. Officer Wipf testified that he felt that the cart was obviously loaded.

[¶ 15.] Officer Wipf could not, however, determine whether the pictures of the grain cart admitted into evidence depicted a loaded or empty cart. Importantly, the pictures gave only a still shot of the cart from which no determination could be made on the bounce of the cart. Additionally, the picture of the loaded grain cart was taken in a field and the bottom of the tires could not be seen. Officer Wipf testified "[b]ecause it is sitting on dirt, you can't tell if it is sunk in, it's not like it's sitting on a black—or cement road. You have that sitting in the field." The trial court found that, at the time of the stop (the relevant time in question) Officer Wipf noticed that the tires were squatted and that there was no bounce and that this indicated to Wipf that the cart was loaded.

[¶ 16.] When testimony is considered, "the trial court is in the best position to assess the credibility of witnesses, weigh the conflicting evidence and observe the witnesses and the evidence first hand." *Geraets v. Halter*, 1999 SD 11, ¶ 18, 588 N.W.2d 231, 234. Accordingly, we conclude that, under an objective standard, Officer Wipf was able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion. Thus, reasonable suspicion existed to stop the vehicle.

[¶ 17.] After the initial stop, Officer Wipf made further observations that prompted further detention and allowed him to weigh the vehicle.

> The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.

*State v. Ramirez,* 535 N.W.2d 847, 849 (S.D.1995) (quoting *State v. Watson,* 165 Conn. 577, 345 A.2d 532, 537 (1973)). Barton told Officer Wipf that the cart was loaded and then rolled back the tarp to allow him to view the contents. Officer Wipf noted that the cart was three quarters or more filled with grain. Based on this observation, Officer Wipf's suspicion that the cart was overweight was buttressed.

[¶ 18.] We need not reach the issue of whether SDCL 32–22–50 requires probable cause for the weighing of vehicles. After Officer Wipf observed the grain, he asked Barton if he could weigh the cart and Barton consented. Since Barton consented to the weighing of the vehicle there is no need to discuss the issue of probable cause. It is firmly established that "consent given to law enforcement to conduct a search satisfies the Fourth Amendment search and seizure provisions and eliminates the necessity to obtain a warrant." *State v. Dreps,* 1996 SD 142, ¶ 9, 558 N.W.2d 339, 341.

### ISSUE TWO

[¶ 19.] **Whether the state proved that Barton was overweight on a single axle.**

[¶ 20.] Barton argues that the grain cart that he was pulling had two axles and not one as claimed by the state. Barton was charged under SDCL 32–22–16(1) which states:

> No motor vehicle or combination of vehicles operating on a public highway may have a weight:
>
> > (1) In excess of twenty thousand pounds on any one axle, or in excess of the tire weight per inch of tire width prescribed by § 32–22–21, including all enforcement tolerances[.]

[¶ 21.] The Kinze 1200 grain cart that Barton was pulling had four tires. The cart had two tires on each side which were positioned side by side, much the same as dual tires on a truck. The two tires on each side were connected to a single hub. There was no member connecting the hub on the right side of the cart to the hub on the left. Essentially, Barton is arguing that his cart had two axles because there was no shaft connecting the two tires on the left side with the two tires on the right side of the cart. The state argues that, under the applicable statutes, there did not actually have to be a shaft connecting the tires on either side in order to be considered a single axle vehicle.

[¶ 22.] The definition of "single axle" is found in SDCL 32–14–1(30):

> "Single axle" or "One axle," one or more consecutive axles whose centers may be included between two transverse vertical planes spaced forty inches or less apart, extending across the full width of the vehicle[.]

[¶ 23.] Barton cites Webster's New Collegiate Dictionary (1928) as defining an "axle" as "a transverse bar or shaft connecting the opposite wheels of a car or carriage." "Axle" is also defined as "[a] supporting shaft or member upon which a wheel or wheels revolve." American Heri-

tage Dictionary 146 (2d College ed 1985). From the above definitions, an axle can either extend across a vehicle or simply be a member on which a wheel revolves. However, the relevant inquiry in this case is how our legislature intended to define "axle" with regard to its statutory scheme.

[¶ 24.] On the cart in question, the tires were attached to a member and were allowed to revolve; thus the tires were attached to an axle. The plain language of SDCL 32–14–1(30) allows for one or more "consecutive axles" to still be considered a single axle. A "consecutive axle" is an axle that follows another axle along the length of the vehicle, not across or along the width of the vehicle.

[¶ 25.] The definition of "consecutive" as seen in SDCL 32–14–1(30) can be gleaned from an examination of other statutes enacted to work in harmony. SDCL 32–22–16.1 provides a formula for use with SDCL 32–22–16 and sheds some light on how the legislature intended the term "consecutive axles" to be applied. SDCL 32–22–16.1 states:

> For the purposes of § 32–22–16 the maximum gross weight on a group of two or more *consecutive axles* allowable on a public highway shall be determined by the following formula:
>
> W =500 [LN/(N–1) + 12N + 36]
>
> In applying the above formula, "W" equals the overall gross weight on any group of two or more *consecutive axles* to the nearest five hundred pounds, "L" equals the distance measured longitudinally to the nearest foot from the *foremost axles to the rearmost axle in a group of two or more consecutive axles,* and "N" equals the number of axles in group under consideration. (emphasis added).

In reading this statute, "consecutive axles" are axles that follow each other with regard to the length of the vehicle *i.e.* "from the foremost axles to the rearmost axles."

[¶ 26.] In order for the formula embodied in SDCL 32–22–16.1 to work, the axles must be positioned one in front of the other along the length of the vehicle, or "consecutive axles." If we were to follow Barton's argument that the cart in question had two axles, one directly across the width of the vehicle from the other one, SDCL 32–22–16.1 would not work. Barton's interpretation of two axles ends in an absurd result. Since these statutes were enacted to work together, we must presume that when the legislature had the term "consecutive axles" in mind, they meant that the axles would follow each other along the length of the vehicle. Thus, even if two axles are present along the length of a vehicle, they are considered one axle by statute if they are within forty inches of each other. *See* SDCL § 32–14–1(30) (1998).

[¶ 27.] The fact that one hub is located across the width of the vehicle from another hub does not change the fact that this vehicle is considered to have one axle as per statute. Again, looking at the definition, a "single axle" is described as "one or more consecutive axles *whose centers* may be included *between two transverse vertical planes* spaced forty inches or less apart, extending across the full width of the vehicle[.]" *Id.* (emphasis added). According to the Doctrine of the Last Antecedent, " '[i]t is the general rule of statutory as well as grammatical construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation.' " *Rogers v. Allied Mut. Ins. Co.,* 520 N.W.2d 614, 617 (S.D.1994) (citations omitted). Thus, in examining the statute, it is not the axle, but the "transverse plane" that must extend across the width of the vehicle.

[¶ 28.] If it was the intent of the legislature that a shaft must physically connect the two hubs, it could have indicated that intention. It did not. Instead it chose to define "single axle" by using a "transverse plane." The use of the term "transverse plane" and not a term indicating physical connection indicates that the legislature envisioned scenarios where a vehicle could be considered single axle per statute while not having a connecting member joining the adjacent hubs.

[¶ 29.] As applied to Barton's grain cart, there was only one axle or hub along the length of the vehicle. Because there was only one hub present, it necessarily had to fall between two transverse vertical planes spaced forty inches or less that extend the width of the vehicle.[2] No statute prescribes that a physical shaft connecting the left and right hubs must be present. As such, Barton's cart falls under the statutory definition of a "single axle."

## ISSUE THREE

[¶ 30.] **Whether the court erred in denying Barton's motion for a jury trial.**

[¶ 31.] Barton argues that the trial court erred in not granting his request for a jury trial. Barton recognizes that this Court has held that the civil penalty for overweight violations is not penal in nature. *See State v. Feiok*, 364 N.W.2d 536 (S.D.1985). However, Barton urges this Court to reconsider its position. Barton argues that increased fines along with social stigma and possible revocation of a person's driver's license warrant a jury trial in overweight cases.

[¶ 32.] We choose to stand by our previous rulings. "The Supreme Court of the United States decided long ago that the constitutional jury trial guarantee 'in all criminal prosecutions' extends only to the prosecution of serious crimes." *State v. Auen*, 342 N.W.2d 236, 237 (S.D. 1984) (citations omitted). A jury trial request may be denied where the offense carries no more than a six-month jail sentence and the court assures the defendant at the time of the request that no jail sentence will be imposed. *See Id.* at 238. In the case at bar, the maximum penalty permitted by statute was thirty days incarceration and Judge Martin assured Barton that he would not receive a jail sentence. Accordingly, the request for a jury trial was properly denied.

[¶ 33.] Regarding fines, in *Feiok* we held that overweight truck fines are civil in nature. Furthermore, considering the seven criteria set forth in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), we held that the fines are not so punitive as to negate the legislature's intention to impose a civil penalty.[3] *See Feiok, supra*. Barton argues the increased fines since the time of

---

2. Two consecutive axles spaced more than forty inches apart but less than ninety-six inches apart would be considered "tandem axles." *See* SDCL 32–14–1(33).

3. The factors are:
   Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions.
   *Feiok*, 364 N.W.2d at 540 (quoting *Kennedy*, 372 U.S. at 168, 83 S.Ct. at 567–68, 9 L.Ed.2d at 661).

*Feiok,* should cause us to reconsider our previous rulings.

[¶ 34.] In *State v. Goffe,* 41 Conn.App. 454, 676 A.2d 1377 (Conn.App.Ct.1996), the Connecticut Appellate Court considered whether or not a jury trial should be awarded in an overweight truck case very similar to the case at hand. The fine in *Goffe* totaled $11,784 for overweight violations. In following reasoning almost identical to *Feiok,* the court held that, when there is no chance of imprisonment, there is no right to a jury trial even in light of a rather large fine. *See id.*

[¶ 35.] Additionally, Barton cites *Landry v. Hoepfner,* 818 F.2d 1169 (5th Cir.1987) for the proposition that collateral effects can turn a petty crime into a serious one for the purposes of a jury trial. Our case is much different. *Landry* was a DWI case and the court characterized it as a *malum in se* crime based on social and ethical judgments and several factors premised on Louisiana law. The court noted that an offender could be subject to:

> 1) a six month jail term, 2) a fine of up to $ 500, 3) serious economic repercussions, such as an increase in insurance premiums, 4) public opprobrium, and 5) a sixty day suspension of his driver's license. Additionally, a first offender may be ordered, as Landry was, to attend driver's education classes, to attend a substance abuse clinic and to perform community service work.

*Landry,* 818 F.2d at 1177(citation omitted). We cannot say that an overweight violation is *malum in se.* Society's view on excessive drinking and driving has evolved to a point where not only is it illegal but those who choose to drink excessively and drive are condemned morally. This is not the case with overweight violations. At this time, an overweight violation is not viewed as evil in itself. Furthermore, no due process violation is present in this case. As addressed in *Feiok,* "we conclude that defendant has been given all the process that is due him by reason of the procedural safeguards afforded to him under SDCL 32–22–16, the criminal statute." *Feiok,* 364 N.W.2d at 541.

[¶ 36.] Under the facts of this case we hold that the trial court did not err in denying Barton's request for a jury trial.[4]

## CONCLUSION

[¶ 37.] The trial court properly found that Officer Wipf was within his authority in stopping Barton. The vehicle had one axle according to our statutory definition and application. No jury trial was required.

[¶ 38.] Affirmed.

[¶ 39.] MILLER, Chief Justice, AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur.

[¶ 40.] LIEBERMAN, Circuit Judge, for SABERS, Justice, disqualified.

---

4. A significant increase in fine schedules could foreseeably result in serious collateral effects, including penalties for non-payment. At some time, the fine may prove to be so devastating and onerous to a defendant's business and personal life that a jury trial would be the only means to appropriately safeguard a defendant's rights.